Hon. Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF SEATTLE AND ITS DEPARTMENT, SEATTLE CITY LIGHT,<br><br>Defendants. | CASE NO.  16-CV-889 (RAJ)<br><br>UNITED STATES' MOTION FOR SUMMARY JUDGMENT<br><br>Noted for consideration:  September 30, 2016 |

Plaintiff United States of America (United States), on behalf of its agency the Federal Bureau of Investigation (FBI), hereby moves this Court to grant summary judgment against the City of Seattle and its Department, Seattle City Light ("City Light" and collectively, the "City"), to prevent the City from disclosing in response to a request the City has received under the Washington State Public Records Act (PRA), RCW 42.56, *et seq*., sensitive law enforcement information, which was shared with the City by the FBI pursuant to a promise of confidentiality and in furtherance of the FBI's national security and criminal investigative missions.  The limited privileged information provided to City Light consisted of the location of each pole (identified by street intersection or street address); the pole number; and dates of

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  their installation, or notification of installation, and removal, or notification of removal, by

2  the FBI and the name and contact information of an FBI employee in the Seattle Division

3  who was the City's point of contact (Protected Information).

4      At stake in this case is the potential disclosure of information concerning the

5  installation of sensitive FBI covert surveillance equipment – specifically, covert surveillance

6  cameras installed on City Light electric power transmission poles – used by the FBI in

7  limited, specific circumstances in furtherance of duly authorized FBI investigations.  The FBI

8  shared this information with the City, pursuant to a City Light request, and a promise of

9  confidentiality by the City Light Security Manager, to ensure that the FBI's installations

10  would not be compromised and to guard against a potential disruption of investigations

11  should a City Light employee discover them.  The City may not release the Protected

12  Information because it is (1) protected by the federal law enforcement privilege; (2) federal

13  property, subject to the FBI's right to control and prohibit the disclosure of the information by

14  the City, absent the express authorization of the FBI; and (3) expressly protected from

15  disclosure by the PRA.  Because the City has notified the FBI of its intent to release the

16  Protected Information in response to the PRA request, absent a permanent order from this

17  Court prohibiting it from doing so, the United States seeks permanent injunctive and

18  declaratory relief.

19      This Motion is based on the previously-filed declarations by Steven Gumtow,

20  Supervisory Special Agent (SSA) and Unit Chief of the Video Surveillance Unit, Technical

21  Collections Branch of the FBI's Operational Technology Division (OTD) (Dkt. No. 4), and

22  by Gregory W. Jennings, Supervisory Special Agent and Chief Division Counsel for the

23  Seattle Division of the FBI (Dkt. No. 3).[1]

24

25

26

---

27  [1]  In addition, as stated in the United States' Motion for Temporary Restraining Order (TRO)(Dkt. No. 2), should the Court desire additional information, and if the Court grants it leave to do so, the United States is prepared to submit a

28  classified supplemental declaration by SSA Gumtow, *in camera, ex parte,* and under seal, providing additional information for the Court's review.  Motion for TRO at 3; Gumtow Decl. ¶ 20.

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# FACTUAL STATEMENT

### A.    FBI's Authorized Use of Video Surveillance in its Investigations

As the Court is aware, the FBI is authorized to use a pole camera in limited circumstances in furtherance of an authorized investigation of a particular subject, when use of the method is reasonably likely to achieve the objectives of the investigation.  Declaration of Steven Gumtow (Gumtow Decl.) ¶ 12.  The use of this technique is authorized by the Attorney General Guidelines for Domestic FBI Operations and governed by FBI policy, which sets forth specific parameters and guidelines for use of covert surveillance equipment in furtherance of FBI national security and criminal investigations.[2]  *Id.* at ¶ 10; Exhibit 1 to Gumtow Decl. (FBI Domestic Investigations and Operations Guide (DIOG)) at 18.6.3.5; Exhibit 2 to Gumtow Decl. (FBI form FD-759).  Importantly, the FBI utilizes surveillance cameras only in furtherance of an authorized investigation of a particular subject.  Gumtow Decl. at ¶¶ 11, 12.  Unlike many other law enforcement entities, the FBI not only conducts criminal law enforcement investigations, but is also responsible for counterintelligence and counterterrorism investigations (national security investigations).  *Id.*¶ 12.  This dual role creates heightened sensitivities with respect to both the FBI's use of this technique and the corresponding necessary equipment, which the FBI protects as sensitive tradecraft.  *Id.*

Because FBI pole cameras are used only for surveillance of a particular subject in connection with a specific investigation, they are installed in relatively close proximity to a location where a subject is believed to be located or where the subject is anticipated to be located in the future, such as a residence, business, or regularly frequented location.  Gumtow Decl. ¶ 11.  For this reason, disclosure of the location of an FBI pole camera would reveal the location of a subject or a location of interest to an FBI investigation and could thereby lead to the discovery of the subject's identity.  *Id.* ¶ 22.

Additionally, a subject of an FBI investigation may be alerted to the existence of an FBI investigation by disclosure of a currently or previously installed FBI pole camera trained

---

[2]   The Attorney General Guidelines for Domestic FBI Operations is available at:
http://www.justice.gov/archive/opa/docs/guidelines.pdf (last visited August 7, 2016).

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   on the subject's current or past location.  Gumtow Decl. ¶ 23.  Armed with such knowledge, a

2   subject would not only be able to evade further investigation by the FBI, but would also be

3   able to employ countermeasures to impede further investigation such as destroying, hiding, or

4   otherwise concealing evidence; intimidating or retaliating against cooperating witnesses; or

5   by simply fleeing the jurisdiction.  *Id.*  Disclosure could also allow any individual, other than

6   the subject of an investigation, who is intent on interfering with or thwarting the investigation

7   to do so.  *Id.* ¶ 24.  Thus, revelation of the subject of an FBI investigation resulting from the

8   unauthorized disclosure of the location of an FBI pole camera could have a devastating

9   impact on an investigation.  *Id.* ¶ 23.

10       Further, disclosure of the location of an FBI pole camera could also potentially

11   endanger FBI agents handling the case, undercover personnel, or confidential human sources

12   working in cooperation with the FBI, and adversely affect public safety.  Gumtow

13   Decl. ¶¶ 23, 25, 26.

14       Because pole cameras are used only in the furtherance of specific investigations,

15   disclosure of the existence and location of an FBI pole camera also creates an unacceptable

16   risk of an unwarranted invasion of privacy.  An innocent third party could be falsely

17   "identified" as a subject of FBI investigation, and therefore stigmatized (or worse) as a

18   criminal or adversary of the United States, merely by the disclosure of the fact that an FBI

19   surveillance camera is or was located in close proximity to the individual's residence or

20   business.  Gumtow Decl. ¶ 27.  And, of course, if a decision is made not to file charges,

21   public disclosure or innuendo that a person was the subject of FBI investigation can have very

22   harmful consequences for an individual in his or her community.  *Id.*

23       The FBI surveillance cameras themselves involve sensitivities, including the identity,

24   technical capabilities, operational utilization, and housing system (or concealment) of each

25   system and its component parts.  Gumtow Decl. ¶¶ 28 - 31.  If equipment is stolen because its

26   location was improvidently disclosed, information concerning the capabilities, methods, and

27   limitations of FBI equipment could be used by individuals to exploit and evade FBI

28   surveillance methods.  *Id.*  Revealing characteristics about these technologies would greatly

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   reduce the effectiveness of these technologies as an investigative tool for the FBI and render

2   the results of surveillance unreliable.  *Id.*

3        Publication of the number of FBI pole cameras and the frequency with which they are

4   used in any particular location would, by itself, diminish the effectiveness of the technique.

5   Gumtow Decl. ¶ 35.  By identifying where individual cameras and clusters of cameras are, or

6   have been placed in the past, adversaries and criminal actors could identify high-crime or

7   high-interest areas commonly under FBI investigation, as well as areas where cameras have

8   not been used or have been used with less frequency.  *Id.*  Armed with this information,

9   adversaries would be able to develop a kind of "heat map" of FBI surveillance, thereby

10  allowing them to take evasive measures to avoid detection and impede the FBI's ability to

11  lawfully detect, interdict, and apprehend them.  *Id.*

12       The federal interests in protecting information concerning the use and installation of an

13  FBI surveillance camera do not diminish with the removal of a camera.  Gumtow Decl. ¶¶ 32

14  - 35.  The FBI may remove a pole camera if, for example, a subject changes location or

15  habits; if the subject returns, the camera may need to be reinstalled.  *Id.*  Moreover, the

16  removal of a pole camera does not mean that the FBI no longer has investigative interests in

17  protecting the secrecy of its location.  A subject of FBI investigation may be alerted to the

18  existence of an FBI investigation by disclosure of an existing or previous FBI pole camera

19  trained on the subject's current or past location, and that subject could decide to employ

20  countermeasures to impede further investigation and destroy, hide, or otherwise conceal

21  evidence.  *Id.* ¶¶ 23, 32.

22       The FBI may also use a camera installation location for surveillance in more than one

23  case.  Gumtow Decl. ¶ 33.  A particular power pole may be used by the FBI repeatedly

24  because it is ideally located and suited to an FBI investigation for technical or other reasons.

25  *Id.*  In this context, publicly disclosing the locations and number of FBI pole cameras, and the

26  frequency with which they are used at those locations may, by itself, diminish the

27  effectiveness of the technique, as subjects of criminal or national security investigation could

28  then take evasive measures to avoid detection.  *Id.* ¶ 35.

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    In sum, the FBI's use of the pole camera technique is a critical tool in FBI

2 investigations of criminal violations and national security threats.  Disclosure of even minor

3 details about their use may injure important federal interests because, much like a jigsaw

4 puzzle, each detail may aid adversaries in piecing together information about the capabilities,

5 limitations, and circumstances of the equipment's use, and would allow adversaries to

6 accumulate information and draw conclusions about the FBI's use of this technology in order

7 to evade effective, lawful investigation by the FBI.  Gumtow Decl. ¶¶ 21, 35.

8    **B.    Federal, State and Local Information Sharing**

9    Information sharing among federal, state, and local government entities is essential to

10 effective law enforcement and to the protection of the United States' national security.

11 Recognizing certain limitations in sharing information in the wake of the terrorist attacks of

12 September 11, 2001, the federal government implemented new information-sharing initiatives

13 in order to better serve and protect the nation's interests.[3]  These initiatives have permitted

14 United States law enforcement and national security agencies to communicate more freely

15 among one another and with state and local partners, when necessary, to work cooperatively

16 to protect the United States from criminal and national security threats.  With respect to the

17 FBI, the Attorney General issued specific information-sharing provisions in the Attorney

18 General Guidelines for Domestic FBI Operations ("AGG-DOM"), including provisions for

19 "permissive sharing," with state and local government agencies, when related to the

20 responsibilities of those agencies.[4]

21    With this authority, and in furtherance of its national security and criminal law

22 enforcement missions, the FBI Seattle Field Office began sharing the Protected Information

23 with City Light Security Personnel in or around 2013.  Gumtow Decl. ¶ 13.  The Protected

24 _____

25 [3] *See, e.g.*, Statement of Robert J. Jordan, Apr. 17, 2002, available at:

26 https://archives.fbi.gov/archives/news/testimony/information-sharing-initiatives (last visited Aug. 7, 2016); National
Strategy For Information Sharing, available at: https://archives.fbi.gov/archives/news/testimony/information-sharing-

27 initiatives (last visited Aug. 7, 2016).

28 [4]  AGG-DOM § VI(B)(1)(b), available at: https://www.justice.gov/archive/opa/docs/guidelines.pdf. (last visited
Aug. 7, 2016).

1   Information was shared by the FBI at the request of City Light in order to prevent FBI

2   equipment from being removed, tampered with, compromised or destroyed by City Light

3   utility personnel who might discover the pole cameras on City Light poles during line

4   inspection or repair and mistakenly assume they were unauthorized installations.  *Id*.  Further,

5   it was shared with the City because the FBI believed that the Protected Information would be

6   held in confidence by the City and used only for the limited purpose for which it was shared

7   by the FBI, in recognition of the fact that it constituted highly sensitive, privileged FBI

8   information.  *Id*. ¶ 14.  The limited privileged information provided to City Light consisted of

9   the location of each pole (identified by street intersection or street address); the pole number;

10  and dates of its installation, or notification of installation, and removal, or notification of

11  removal, by the FBI.  *Id*. ¶ 13.  City Light was also necessarily in possession of the name and

12  contact information of an FBI employee in the Seattle Division who was its point of contact.

13  *Id*.

14          **C.      PRA Requests to City of Seattle**

15           On September 17, 2015, the FBI Seattle Division was informed by the Seattle City

16  Attorney's Office that Seattle City Light had received a request under the PRA from a

17  reporter with KIRO 7, seeking, "all records related to the installation of law enforcement

18  surveillance cameras on Seattle City Light poles and property."  Jennings Decl. ¶ 3, Exhibit A

19  (Email from Assistant City Attorney Mary Perry to FBI SSA Greg Jennings).  Thereafter, the

20  City provided for the FBI's review two documents containing the Protected Information,

21  which the City planned to release in response to the KIRO request.  *Id*. ¶ 4.  One document

22  was an email thread between a City Light Security Manager and law enforcement personnel

23  regarding what appeared to potentially be a surveillance camera.  Jennings Decl. ¶ 4,

24  Exhibit B (August 4, 2015 e-mail string).  The apparent purpose of the communication,

25  initiated by the City Light Security Manager, was to inquire whether an object observed and

26  photographed by a City Light customer was a surveillance camera installed by one of their

27  agencies, so that if it was, it could be "add[ed … ] to the list."  *Id*.  Notably, the email begins

28  with the City Light Security Manager's acknowledgement that "cameras [are] installed for

1   covert needs from your respective organizations on our poles," and concludes by saying, "*As*
2   *always this is kept confidential*."  *Id.*  (emphasis added).

3        The second document provided to the FBI for review was a spreadsheet entitled
4   "CCTV-Pole Use by LL."  Jennings Decl. ¶ 4.  The spreadsheet contained a list of law
5   enforcement surveillance cameras, identified by location, pole number, law enforcement
6   agency, names and phone numbers of the agencies point of contact, date installed, date
7   removed, and additional "notes."  *Id.*  The information regarding FBI pole cameras in this
8   spreadsheet had been compiled by the FBI and shared in confidence with City Light's
9   security personnel solely for law enforcement purposes.  Gumtow Decl. ¶¶ 13-15.

10       The FBI strongly objected to release of *any* of the Protected Information by the City,
11  because the information was protected by the law enforcement privilege and subject to an
12  express promise of confidentiality.  Jennings Decl. ¶ 5.  However, on October 30, 2015, the
13  City informed the FBI by letter that, with the exception of the camera locations, the City
14  would release the Protected Information on the e-mail chain and the spreadsheet, including
15  the name and telephone numbers of the FBI employee who was the FBI's point of contact for
16  the City Light security manager, as well as the identification of each FBI camera as belonging
17  to the FBI.  *Id.*  The City's October 30, 2015 letter further stated that unless the FBI obtained
18  an injunction prohibiting disclosure within in 10 days, it would unilaterally release the
19  information.  *Id.*, Exhibit C (Oct. 30, 2015 notice letter from Assistant City Attorney Mary
20  Perry to FBI SSA Greg Jennings).  The FBI continued to object strongly to the release of its
21  Protected Information, but did not pursue litigation.  On or about November 20, 2015,
22  pursuant to its stated intentions, disclosed, without the consent of the FBI, a portion of the
23  Protected Information as it appeared in the August 4, 2015 email chain (Exhibit B) and the
24  spreadsheet.  Jennings Decl. ¶ 6, Exhibit D (spreadsheet).  The City withheld the remainder of
25  the Protected Information by means of redaction.  *Id.*, Exhibit D.

26       In January 2016, the City informally notified the U.S. Attorney's Office that, following
27  its November release to the KIRO reporter, City Light had received a second PRA request,
28  from Phil Mocek, a private citizen, seeking the same information and challenging the City's

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  withholding of the Protected Information which had been redacted from the November

2  release. Jennings Decl. ¶ 7. Shortly thereafter, the City formally notified the FBI of this

3  request by letter to the U.S. Attorney's Office. *Id.* Exhibit E (January 13, Letter from Public

4  Records Office Stacy Irwin to AUSA Peter Winn). In the same notice, the City also stated

5  that it did not intend to withhold *any* of the FBI's Protected Information unless the FBI

6  obtained an injunction prohibiting such release. *Id.* Because of the sensitivity of the

7  information at stake and the compounding harms that would result from any further

8  authorized release, the FBI requested, and the City agreed, to provide adequate time for the

9  FBI to obtain necessary Department of Justice approvals to initiate this litigation. *Id.*

10     The above-described unauthorized, albeit limited, release of the FBI's Protected

11  Information made by the City has already caused harm to FBI interests by disclosing the

12  name and contact phone numbers of the FBI point of contact for City Light and by tending to

13  reveal the number of FBI cameras. Gumtow Decl. ¶¶ 19, 35. With respect to the employee,

14  the FBI has a long-standing policy of protecting the names of FBI Special Agents and other

15  employees from public disclosure, with limited exceptions not present in this case. *Id.* ¶ 19.

16  Unlike many other law enforcement personnel, FBI employees do not wear uniforms or

17  badges. *Id.* In fact, they are prohibited by FBI policy from wearing employee identification

18  badges outside of FBI office spaces. *Id.* This is to protect FBI security as well as the privacy

19  and personal security of FBI employees and their families who might be targeted for

20  harassment, retaliation, or other exploitation by criminal or foreign intelligence adversaries.

21  *Id.* For these reasons, the unauthorized disclosure already made by the City caused harm to

22  FBI interests and damaged the relationship of trust which previously existed between the FBI

23  and the City. *Id.*

24     Because the City has already disclosed critical, sensitive information in response to a

25  PRA request, the FBI ceased sharing information with the City regarding the installation of

26  FBI surveillance cameras on City Light poles. Gumtow Decl. ¶¶ 18-19. Without such

27  information sharing, the FBI reasonably believes that the FBI's equipment will be removed

28  and/or destroyed if discovered by a City Light line worker, due to the inability of the line

MOTION FOR SUMMARY JUDGMENT
CASE NO. 16-CV-889 (RAJ) - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  worker and City Light to determine whether the equipment is authorized to be present or

2  whether it is a foreign object or unauthorized equipment – the very harms which the City and

3  the FBI began working cooperatively in 2013 to avoid.  *Id.*  This lack of communication and

4  coordination between state and federal government agencies has damaged the FBI's

5  information-sharing abilities in Seattle and is contrary to the strong public interest in effective

6  law enforcement.  *Id.*

7  **ARGUMENT AND AUTHORITIES**

8      **A.**    **Legal Standards**

9      Summary judgment is appropriate if there is no genuine issue as to any material fact,

10  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

11  moving party has the initial burden of demonstrating that summary judgment is proper.

12  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The moving party must identify

13  evidence that it "believes demonstrates the absence of a genuine issue of material fact."

14  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "A material issue of fact is one that

15  affects the outcome of the litigation and requires a trial to resolve the parties' differing

16  versions of the truth."  *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).  Cases

17  pertaining to disputes over disclosure of information are particularly appropriate for summary

18  judgment.  *See Wickwire Gavin, P.C. v. United States Postal Serv.*, 356 F.3d 588, 591

19  (4th Cir. 2004) (summary judgment is the procedural vehicle by which nearly all cases

20  brought under the Freedom of Information Act are resolved).

21      After the moving party meets its burden to prove no genuine issue of material fact

22  exists, the burden then shifts to the opposing party to show that summary judgment is not

23  appropriate.  *Celotex*, 477 U.S. at 324.  To avoid summary judgment, the opposing party

24  cannot rely on speculation or conclusory allegations to defeat the motion.  *Nelson v. Pima*

25  *Cmty. College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("Mere allegation and speculation do

26  not create a factual dispute for purposes of summary judgment."); *see also Lujan v. Nat'l*

27  *Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990) (Conclusory, nonspecific statements in affidavits

28  are not sufficient, and missing facts will not be presumed.).  Finally, the nonmoving party is

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

required to establish that any fact at issue is:  (1) material, *i.e.,* that it is a fact that might affect the outcome of the suit under controlling law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Electric Serv. Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); and (2) that the dispute is genuine or that the evidence is of the nature that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248-49.

A permanent injunction may be entered where a party demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and ( 4) that the public interest would not be disserved by a permanent injunction." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de* C.V., 762 F.3d 867, 879 (9th Cir. 2014) (quoting *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006)) (Court of Appeals remanded motion for permanent injunction to the district court where district court's analysis left unclear whether it considered all relevant factors in assessing balance of hardships).  When this standard is met, the court is to enter a specific order describing in reasonable detail the act or acts sought to be restrained.  Fed. R. Civ. P. 65(d); *3M v. Pribyl,* 259 F.3d 586 (7th Cir. 2001) (upholding permanent injunction prohibiting the disclosure of misappropriated 3M trade secrets by former 3M employees).

The U.S. Supreme Court has made it clear that this test must be applied according to "well-established principles of equity," regardless of the standard courts would otherwise apply in considering the underlying statutory or common law right.  For example, in *eBay Inc* the Court admonished the lower courts for having departed from this standard in considering a dispute arising under the Patent Act.  "The creation of a right," the court noted, "is distinct from the provision of remedies for violations of that right." *eBay Inc.,* 547 U.S. at 392.  "Like a patent owner, a copyright holder possesses 'the right to exclude others from using his property,'" the Court stated, and, "this Court has consistently rejected invitations to replace

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  traditional equitable considerations," to fashion a remedy for violation of that right.  *ld.*
2  (internal citations omitted).

3  **B.   The Protected Information is not Subject to Disclosure**

4       As set forth in more detail below, the information at issue in this case is protected by
5  the common law federal law enforcement privilege.  The information is also federal property
6  and not subject to disclosure under the PRA.  Finally, Section 42.56.290 of the PRA explicitly
7  exempts from the PRA information that is exempt under other statutes, and here the Protected
8  Information is exempt under the FOIA.

9            **1.   The Protected Information is Subject to the Federal Law
10                Enforcement Privilege**

11      The City cannot disclose the protected information because it is highly sensitive law
12  enforcement information, which is protected by the federal law enforcement privilege.

13             **a.   The Evolution of the Common Law, Law Enforcement
14                  Privilege**

15      The common law has long protected sensitive law enforcement information.  The
16  Supreme Court first recognized the law enforcement privilege in 1957 as a matter of federal
17  common law to protect "the public interest in effective law enforcement."  *Roviaro vs. United*
18  *States*, 353 U.S. 53, 59 (1957).  The privilege is "rooted in common sense as well as common
19  law" and recognizes that "law enforcement operations cannot be effective if conducted in full
20  public view."  *Black vs. Sheraton Corp. of Am.*, 564 F.2d 531, 542 (D.C. Cir. 1977).  The
21  Second Circuit explained the evolution of the law enforcement privilege when it summarized:

22       [T]he law enforcement privilege [] has been recognized in the absence of a
23       statutory foundation, and [] is largely incorporated into the various state and
         federal freedom of information acts.  The purpose of this privilege is to
24       prevent disclosure of law enforcement techniques and procedures, to
         preserve the confidentiality of sources, to protect witness and law
25       enforcement personnel, to safeguard the privacy of individuals involved in an
26       investigation and otherwise prevent interference with an investigation.

27  *In re Dep't of Investigation*, 856 F.2d 481, 483-84 (2d Cir. 1988).

28

In general, the law enforcement privilege is "grounded in well-established doctrine and is widely recognized by the federal courts."  *In re The City of New York*, 607 F.3d 923, 941 n.18 (2d Cir. 2010).  The privilege is designed, *inter alia*, to prevent disclosure of law enforcement techniques and procedures that, once revealed, could risk future circumvention of the law or compromise of the technique.  *Id.* at 944; *United States v. Van Horn*, 789 F.2d 1492, 1507-1508 (11th Cir. 1986); *United States v. Winner*, 641 F.2d 825, 831 (10th Cir. 1981) (stating that the "law enforcement investigative privilege is based primarily on the harm to law enforcement efforts which might arise from public disclosure of investigatory files") (internal citations omitted); *Dellwood Farms v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997) ("[T]he control of criminal investigations is the prerogative of the executive branch, subject to judicial intervention only to protect [individual] rights.").

The lower courts subsequently have applied the *Rovario* privilege to sensitive law enforcement information whose disclosure would harm an ongoing investigation, as well as to specialized information whose disclosure would undermine the effectiveness of law enforcement techniques.[5]  *See Van Horn*, 789 F.2d at 1508-09 (privilege applies to nature and location of surveillance equipment); *United States v. Cintolo*, 818 F.2d 980, 1002 (1st Cir. 1987) (location of electronic surveillance device privileged); *United States v. Harley*, 682 F.2d 1018, 1020–21 (D.C. Cir. 1982) (privilege applies to location of surveillance equipment); *United States v. Green*, 670 F.2d 1148 (D.C. Cir. 1981) (same); *U.S. v. Rigmaiden*, 844 F. Supp. 2d 982 (D. Ariz. 2012) (geo-location techniques privileged).  The privilege has also been used to protect the identities of individuals involved in law enforcement operations, including officers, subjects and perceived subjects.  *In re City of New York*, 607 F.3d 923 (2d Cir. 2010); *In re Dep't of Invest.*, 856 F.2d at 486.  Ultimately, the law enforcement privilege has been used by courts to protect exactly the type of information at issue here – information that, if disclosed, could undermine the integrity of an

---

[5] The *Roviaro* privilege is sometimes called the "law enforcement privilege," when protecting the integrity of a particular investigation, and the "law enforcement sensitive" privilege when protecting law enforcement techniques.  *See e.g.*, 28 C.F.R. § 16.96 (exempting sensitive law enforcement information from disclosure provisions of the Privacy Act.)

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   investigation, reveal covert law enforcement techniques, or invade the privacy rights of

2   individuals.

3              **b.**     **The Law Enforcement Privilege Prohibits Disclosure of the**

4                       **Protected Information**

5       The law enforcement privilege applies to the Protected Information.  Federal courts

6   have specifically found that the law enforcement privilege "applies [] to the nature and

7   location of electronic surveillance equipment."  *Van Horn*, 789 F.2d at 1508 (11th Cir. 1986).

8   This is because, "[d]isclosing the precise locations where devices are hidden or their precise

9   specifications will educate criminals regarding how to protect themselves against police

10   surveillance."  *Id.*  Courts have routinely protected this type of information under FOIA

11   Exemption 7.  *See New York Civ. Liberties Union v. Dep't of Homeland Security,*

12   771 F. Supp. 2d 289 (S.D.N.Y. 2011) (protecting location of license plate readers and

13   cameras); *Lewis-Bey v. United States Dept. of Justice*, 595 F. Supp. 2d 120, 138

14   (D.D.C. 2009) (protecting the location of electronic surveillance devices); *Boyd v. BATFE*,

15   570 F. Supp. 2d 156 (D.D.C. 2008) (protecting information relating to monitoring

16   equipment).

17       Here, as set forth in the Gumtow Declaration, release of the Protected Information

18   could reasonably be expected to interfere with the FBI's ability to carry out its investigative

19   missions, for it would disclose the location of subjects of FBI investigations.  *See* Gumtow

20   Decl. ¶¶ 11, 22-24.  Such disclosure could have a devastating impact on an ongoing

21   investigation, and could expose FBI agents and other individuals cooperating in the

22   investigation to increased risk of physical harm.  *Id.* at ¶¶ 25, 26.  Additionally, disclosure of

23   the Protected Information could reveal the FBI's sensitive tradecraft and thereby risk

24   circumvention of the law, *e.g.,* where disclosure would subject FBI surveillance equipment to

25   theft and exploitation, where such disclosure would eliminate the potential for the FBI to re-

26   use a particular pole, which may be particularly well-suited for use of a pole camera,

27   *id* at ¶ 33, and where publication of the number of FBI pole cameras, and the frequency with

28

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   which they are used in any particular location, would diminish the effectiveness of the

2   technique, *id.* ¶ at 35.

3         Moreover, disclosure of even minor details of the Protected Information could

4   jeopardize the effectiveness of the FBI's technique as a whole.  This is because, "much like a

5   jigsaw puzzle, each detail may aid adversaries in piecing together information about the

6   capabilities, limitations and circumstances of the equipment's use."  Gumtow Decl. ¶ 21.  As

7   a result, "[p]ulling any individual 'thread' of an undercover operation may unravel the entire

8   'fabric'" of the investigation.  *In re City of New York*, 607 F.3d at 944.  For this reason, each

9   piece of Protected Information pertaining to the installation of FBI pole cameras which was

10  shared by the FBI in confidence with the City must be strictly protected, to prevent corrosion

11  of the technique as a whole.

12        Protection afforded by the law enforcement privilege is not eliminated once a

13  particular investigation is concluded or a particular surveillance camera has been removed.  *In*

14  *re City of New* York, 607 F.3d at 944 ("An investigation, however, need not be ongoing for

15  the law enforcement privilege to apply as 'the ability of a law enforcement agency to conduct

16  future investigations may be seriously impaired if certain information is revealed to the

17  public." (internal citations omitted)); *Black. v. Sheraton Corp. of America*, 564 F.2d 531, 546

18  (D.D.C. 1977) ("We reject plaintiff's contention that the public interest in nondisclosure can

19  be disregarded simply because the principal investigation involved here has apparently been

20  concluded.").  "The FBI may remove a pole camera if, for example, a subject changes

21  location or habits; if the subject returns the camera will be reinstalled."  Gumtow Decl. ¶ 32.

22  Additionally, as noted above, certain FBI poles may be ideally located for investigative

23  purposes in multiple investigations.  *Id.* at 33; *see also United States v. Green*, 670 F.2d 1148,

24  1153 (D.C. Cir. 1981) ("[T]he identification of a hidden observation post will likely destroy

25  the future value of that location for police surveillance.").  For this reason, the privilege

26  afforded the Protected Information is not lost once a particular camera has been removed or a

27  particular investigation closed.

28

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Importantly, disclosing the locations of FBI pole cameras, whether active or not, could also violate the privacy of individuals, by tending to identify, whether falsely or not, an individual as a criminal or adversary of the United States.  To be sure, this concern extends not only to individuals who are or have in fact been the subjects of an FBI investigation, but also innocent individuals who may live, work, or otherwise be known to frequent the vicinity of the relevant locations.  The law enforcement privilege was created, in part, to protect the privacy of individuals, both law enforcement and civilian, involved in investigations.  *In re City of New York*, *supra*; *In re Dep't of Invest.,* 856 F. 2d at 486 ("[T]he privilege is designed not only to facilitate investigations, but also to protect individuals whose reputation may be damaged by disclosure of investigative leads or statements from witnesses developed during the investigation.").  "Every FBI pole camera is associated with a particular subject or particular investigation and is installed in relatively close proximity to a location where the subject is believed to be located or where the subject is anticipated to be located in the future, such as a residence, business or frequented location."  Gumtow Decl. ¶11.  For this reason, disclosure of pole camera locations would risk not only revealing the identities of the actual subjects of FBI investigation, it would also risk falsely identifying innocent third parties as such subjects, or identifying actual subjects of FBI investigations where no prosecution decision has been made and where, ultimately, no charges may be brought.  *Id.* ¶ 27.

The Protected Information is also shielded by the law enforcement privilege because disclosure of any component of the Protected Information could risk future circumvention of the law or compromise the FBI's ability to effectively use the pole camera technique in the future.  Gumtow Decl. ¶¶ 21-35.

A strong presumption favors the non-disclosure of law enforcement information which can be overcome only with great difficulty.  This is because the need for the law enforcement privilege has only been heightened in recent years because "in today's times the compelled production of government documents could impact highly sensitive matters relating to national security."  *Puerto Rico v. United States*, 490 F.3d 50, 63 (1st Cir. 2007).

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The law enforcement privilege is not absolute; it is a qualified privilege.  *In re City of New York*, 607 F.3d at 940.  The government bears the burden of proving that the privilege applies to the documents or information in question.  *In re Sealed Case*, 856 F.2d 268, 271-72 (D.C. Cir. 1988).  Once the government shows that the privilege applies, to overcome the law enforcement privilege "the party seeking disclosure has the burden of showing that its need for the information outweighs the government's interest in nondisclosure."  *Perez v. United States Dist. Court, Tacoma*, 749 F.3d 849, 858 (9th Cir. 2014); *Black,* 564 F.2d at 546.  Essentially, the courts have used a balancing test based on the "fundamentals of fairness."  *Roviaro*, 353 U.S. at 60.  It must be noted that one must balance governmental interests "with particular care" when faced with an information case "involving conflicts between the federal and state governments."  *Puerto Rico*, 490 F. 3d at 64.  While keeping the balance test in mind, courts have noted that there is a "strong presumption against lifting the [law enforcement] privilege."  *In re City of New York*, 607 F.3d at 929.  To lift the privilege a party must demonstrate a *compelling* need for the information.  *Id.* at 945.  Here, the United States has demonstrated that the Protected Information falls squarely within the law enforcement privilege, and no other party has come forward and demonstrated a compelling need which outweighs the government's interest in nondisclosure.[6]

### 2.    The Protected Information is Federal Property and the United States has the Right to Control its Use and Dissemination.

The Protected Information is federal property – it was compiled by the FBI during the course of carrying out its national security and criminal law enforcement missions, in furtherance of specific, authorized investigations.  Gumtow Decl. ¶¶ 10, 12.  The FBI shared the Protected Information with City Light with the understanding that the City would keep it

---

[6] The public interest espoused in the PRA is not served by the disclosure of law enforcement privileged information belonging to the FBI.  The purpose of the PRA is to provide the citizens of the State of Washington with a mechanism to gain access to information about what the state and local agencies covered by the Act are "up to."  See RCW § 42.56.030.  However, disclosure of detailed information concerning, *inter alia,* the number and location of FBI pole cams, which is the subject of this lawsuit, tells the public nothing about what the City of Seattle, City Light or any other Washington state or local agency is "up to."  Moreover, to the extent any member of public is interested in obtaining information about what the FBI, or any other *federal* agency is up to, Congress has provided the means in the Freedom of Information Act, 5 U.S.C. § 552a, with specific limiting conditions deemed by Congress to be in the national interest.

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    confidential and use it only for the limited purpose for which it was shared, *i.e.,* to prevent the

2    loss and destruction of confidential FBI technical equipment and resulting disruption to FBI

3    investigations.  *Id.* at ¶¶ 13-14.  Furthermore, as discussed above, and as set forth in more

4    detail in the Gumtow Declaration, the Protected Information pertains to sensitive law

5    enforcement matters, techniques and methods not otherwise disclosed to the public, in order

6    to protect important federal interests.  Consequently, the United States maintains a property

7    right to control the use and dissemination of the Protected Information.

8         Information has long been considered property in a variety of contexts.  *See Carpenter*

9    *v. United States,* 484 U.S. 19 (1987) (newspaper column property under 18 U.S.C. § 641);

10   *Animal Legal Def. Fund v. F.D.A.*, 819 F.3d 1102 (9th Cir. 2011); *United States v. Elliott*,

11   711 F. Supp. 425 (N.D. Il. 1989) (confidential commercial information is property under

12   18 U.S.C. § 1343); *SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012) (finding that confidential

13   business information is property in the context of Rule 10b-5).  For example, information has

14   been held to be a "thing of value" in the context of criminal prosecution for theft of property

15   under 18 U.S.C. § 641.[7]  The Supreme Court squarely addressed the issue of confidential

16   business information as property in *Carpenter v. United States,* 484 U.S. 19 (1987).  In

17   *Carpenter*, the Supreme Court considered whether information obtained by a writer for the

18   Wall Street Journal for the purposes of preparing an influential financial column, which the

19   Journal treated as proprietary, confidential information, was property.  The Court held that the

20   intangible nature of the Journal's information did not make it any less property.

21   "Confidential information acquired or compiled by a corporation in the course and conduct of

22   its business is a species of property to which the corporation has the exclusive right and

23   ────────────

24   [7]   In *Chappell v. United States,* 270 F.2d 274 (9th Cir. 1959), it was held, in a case filed under 18 U.S.C. § 641 for the
     appropriation of services of another, that intangibles could not be considered "a thing of value."  Since then, the view of

25   the law reflected in *Chappell* has been rejected and it has been held, in the Ninth Circuit and elsewhere, that government
     information is a "thing of value."  See. *U.S. v Schwartz,* 785 F.2d 673, 681 n. 4 (9th Cir. 1986) (and cases cited) (rejecting

26   *Chappell* as binding precedent in the Ninth Circuit and concluding that that government information is a thing of value.)
     *Id.*; *accord U.S. v. Kueneman,* 94 F.3d 653 *1 n. 3 (9th Cir. 1996) (unreported decision); and see *United States v. Fowler,*

27   932 F.2d 306, 310 (4th Cir. 1991) (agreeing with Second and Sixth Circuits that government information is a "thing of
     value," and therefore its conversion and conveyance may violate 18 U.S.C. § 641).

28

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   benefit, and *which a court of equity will protect through the injunctive process or other*

2   *appropriate remedy.*" *Carpenter* at 26 (internal citations omitted and emphasis added).  In

3   *Carpenter* the Court confirmed the well-established proposition that even in the absence of a

4   written contract, one who acquires special knowledge or information as a result of a

5   confidential relationship with another must account to the principal for any use of the

6   information.  *Id.* at 27-28.  So too here, the City of Seattle acquired limited rights to use

7   protected information belonging to the FBI because of the representation of its City Light

8   Security Manager to keep the FBI's information confidential.  The City is thus bound by that

9   confidential relationship that has arisen between the FBI and the City and subject to the FBI's

10  conditions on the use of the information to which the parties agreed.

11      Courts have long recognized that, as a matter of federal common law, the United States

12  has the authority to enforce its property interest in its records in the context of state public

13  records acts.  In the closely analogous case of *United States v. Napper*, 694 F. Supp. 897

14  (N.D. Ga. 1988), aff'd, 887 F.2d 1528 (11th Cir. 1989), the City of Atlanta was enjoined from

15  disclosing FBI investigative files provided in confidence to the City of Atlanta.  The Court

16  held such files were federal property and that the City of Atlanta could not disclose the

17  records under the state public records act because it had "no right to disseminate" the records.

18  Similarly in *United States v. Story County, Iowa*, 28 F. Supp. 3d 861 (S.D. Iowa 2014), the

19  district court enjoined the county from publicly releasing emails located on the county server

20  but sent and received by a county sheriff in his capacity as a member of a federal board.

21  There the court held that the records were "federal records and not subject to Iowa's Public

22  Records Act."  *Id.* at 872.  The *Story County* Court repeatedly emphasized that the

23  fundamental issue in that case was one of ownership, which is, at its core, the same issue

24  here:  The United States' authority to enforce its property interest.  *Id.* at 872, 876-77.

25      It is also well settled that that which is created or obtained by a government employee

26  in the course of the employee's official duties belongs to the government.  This principle has

27  been applied to documents made, information compiled, or any other property interest created

28  as an exercise of the employee's official duties.  *See e.g., Pfeiffer v. CIA*, 60 F.3d 861, 864

(D.C. Cir. 1995) (report drafted by employee while employed at CIA remained property of CIA); *Sawyer v. Crowell Pub. Co.,* 142 F.2d 497 (2nd Cir. 1944), *cert. denied*, 323 U.S. 735 (1944) (map made in the course of official duties was property of United States, therefore not proper subject of copyright); *United States v. Chadwick*, 76 F. Supp. 919 (N.D. Ala. 1948) (information in the form of notes, memoranda and statements obtained within the course of government employment belongs to government). "Observations a federal employee makes to carry out his [or her] job responsibilities are unquestionably government information." *In re Subpoena in Collins*, 524 F.3d 249, 252 (D.C. Cir. 2008).  Here, the Protected Information was created, obtained, and compiled by FBI personnel during the course of carrying out the FBI's investigative missions; as a result, it is federal property.

        Common sense also supports the notion that the Protected Information is the property of the United States and the United States therefore retains the right to control its use.  A state entity is not in a position to determine the sensitivity of privileged federal government information, compiled by a federal agency during the course of and for purposes of a federal criminal or national security investigation.  It would be incongruous to place responsibility in the hands of a state agency to determine whether and to what extent disclosure of federal government information, shared with it in confidence by the FBI, would harm important federal interests, *i.e.*, by jeopardizing the safety of FBI personnel or equipment, Gumtow Decl. ¶¶ 19, 23, 26; by revealing a subject of an FBI national security or criminal investigation and thereby jeopardizing the investigation, *id.* ¶¶ 22-24; by jeopardizing the safety or privacy rights of other individuals, *id.* ¶¶ 25, 27; or by revealing information which could be used by adversaries to diminish the effectiveness of a protected technique or FBI, tradecraft, *id.* ¶¶ 21, 28, 29-35.  (Indeed, the City here eschews the notion that it has any such responsibility.)  This is why, during the course of a joint investigation between state and federal entities, where the federal government is the principal of the investigation, the federal government determines whether and under what circumstances its information may be disclosed.  *United States v. Loughner*, 807 F. Supp. 2d 828 (D. Az. 2011) (holding that information possessed by Pima County Sherriff as a result of participation in joint

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   investigation led by the FBI was not subject to disclosure under state public records act).  It
2   would be an untenable result if a requestor could obtain Protected Information in response to
3   a PRA request, without any consideration of the harms that would flow from its release and
4   over the express objection of the FBI, when the same information would be protected from
5   disclosure under federal law.

6          Here, the FBI does not seek the return of its information, but simply enforcement of its
7   right to control the use of its information.  As such, the government is entitled to injunctive
8   and declaratory relief to prevent the unauthorized disclosure and dissemination of its
9   property, particularly where, as here, the City obtained the information from the FBI after a
10  City Light manager promised to keep this federal information confidential.  *Chadwick*,
11  76 F.Supp. at 923.

12              **3.    The Protected Information is Exempt from Disclosure Pursuant to
13                      Section 42.56.070 of the PRA.**

14         Section 42.56.070 of the PRA, R.C.W. § 42.56.070, exempts from disclosure
15  information or documents where other statutes "exempt or prohibit disclosure of" the
16  requested information.  As the Washington Supreme Court has summarized, "the PRA's
17  'other statute' exemption allows for a separate statute to preclude disclosure of 'specific
18  information' or entire 'records.'"  *Ameriquest Mortg. Co. v. Office of Attorney Gen.*,
19  170 Wn.2d 418, 440 (2010).  Washington Courts have specifically held that federal statutes
20  constitute "other statutes" under Section 42.56.070.  *See id.* at 440 (Gramm-Leach-Bliley Act
21  other statute under PRA); *Freedom Found. v. Dep't of Transp., Div. of Wash. State Ferries*,
22  168 Wn. App. 278, 287-90 (Wash. Ct. Appls. 2012) (49 C.F.R. § 40.321 "other statute[ ]"
23  under PRA).  The Protected Information would be exempt under the FOIA pursuant to FOIA
24  Exemption 7, 5 U.S.C. § 552(b)(7).

25         First, FOIA Exemption 7(C) protects both the name and phone numbers of the FBI
26  Special Agent listed on the relevant spreadsheets as well as the location of the pole cameras,
27  which could be used to identify witnesses, subjects, and other individuals living and working
28  near the pole cameras and interfere with their personal privacy.  Exemption 7(C) prohibits the

release of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy."

5 U.S.C. § 552(b)(7)(C).  Here, the FBI, a component of the Department of Justice, was the original source of the information, which was used during the course of its authorized national security and criminal investigations.  "Because the DOJ is an agency specializing in law enforcement, its claim of a law enforcement purpose is entitled to deference." *Center for Nat. Sec. Studies v. U.S. Dept. of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003).  It is undisputed that this information was compiled for law enforcement purposes – the FBI compiled the Protected Information in furtherance of its criminal law enforcement and national security investigations by utility technicians unsure of the status of a camera they might encounter while doing maintenance work.

Under FOIA, once the government has established that the information was compiled for a law enforcement purpose, the court must weigh the privacy interests implicated by the release of the requested information against the public's interest in their disclosure.  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989).  In considering the balancing test, Exemption 7(C) protects any information that "could reasonably be expected to constitute" an invasion of privacy that is "unwarranted."

5 U.S.C. § 552(b)(7)(C).  "The only relevant public interest in the FOIA balancing analysis – the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *United States Dept. of Defense v. Fed. Labor Relations Authority*, 510 U.S. 487, 497 (1994).  Federal courts have vigorously protected information that could reveal the identity of individuals involved in investigations due to the "strong interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity." *Computer Prof'ls for Soc. Responsibility v. United States Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996); *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84,

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  91-92 (D.C. Cir. 1984) ([I]ndividuals have a "strong interest in not being associated

2  unwarrantedly with alleged criminal activity.").

3        Here, very little would be revealed by disclosing the Protected Information.  The

4  public is already aware that the FBI uses surveillance equipment.  On the other hand,

5  revealing the Protected Information, in addition to the other harms to federal interests, could

6  reasonably be expected to constitute a violation of individual privacy rights.  Such disclosure

7  could reasonably be expected to identify subjects of FBI investigations or individuals

8  involved in FBI investigations or to falsely impugn individuals as being such subjects or

9  involved persons.  Ultimately, disclosure of the Protected Information would violate the right

10  of privacy of any persons who may work or live or frequent the vicinity of the location of the

11  FBI's surveillance equipment, including the subjects of the investigations.

12        The protected information is also exempt from disclosure under FOIA Exemption

13  7(E), 5 U.S.C. § 552(b)(7)(E), which protects law enforcement records "to the extent that the

14  production of such law enforcement records or information … would disclose techniques and

15  procedures for law enforcement investigations or prosecutions…."  Courts have long held that

16  information pertaining to law enforcement techniques and procedures are properly withheld

17  where disclosure could lead to circumvention of laws and regulations.  *See Lewis-Bey v.*

18  *United States Dept. of Justice*, 595 F. Supp. 2d 120 (D.D.C. 2009) (protecting surveillance

19  techniques); *Fisher v. United States Dept. of Justice*, 772 F. Supp. 7, 12 (D.D.C. 1991)

20  (protecting information where disclosure could alert subjects about techniques used to aid the

21  FBI).

22        This case is analogous to *Lewis-Bey,* 595 F. Supp. 2d 120, where the court invoked

23  Exemption 7(E) to protect "details of electronic surveillance techniques, . . . specifically, the

24  circumstances under which the techniques were used, the specific timing of their use, and the

25  specific location where they were employed."  *Id.* at 138.  Here, like *Lewis-Bey*, disclosure of

26  the protected information would disclose techniques and procedures that could reasonably

27  risk circumvention of the law, *e.g.,* where such disclosure would eliminate the potential for

28  the FBI to re-use a particular pole, which may be particularly well-suited for use of a pole

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

camera.  Gumtow Decl. ¶ 33.  Furthermore, it would likely disclose the numbers of cameras and frequency in which the FBI uses pole cameras in investigations, which is not otherwise public and would be useful to a subject.  *Id.* at 35.  Disclosure of the protected information would jeopardize the effectiveness of the FBI's use of pole cameras in the future; consequently, the protected information is exempt from disclosure under FOIA and, in turn, under the PRA.

<b>CONCLUSION</b>

In conclusion, the FBI is entitled to summary judgment because: (1) the Protected Information should not be disclosed pursuant to the law enforcement privilege; (2) the Protected Information is federal property, and the federal government controls its use and dissemination; and (3) the Protected Information is exempt under the PRA.  Accordingly, the United States seeks an order permanently barring the City from releasing the Protected Information.

DATED this 15th day of August, 2016.

Respectfully submitted,

ANNETTE L. HAYES
United States Attorney


s/ *Kayla C. Stahman*
KAYLA C. STAHMAN
BRIAN C. KIPNIS
Assistant United States Attorneys
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone:  206-553-7970
Fax:      206-553-4067
E-mail:  kayla.stahman@udsdoj.gov
E-mail:  brian.kipnis@usdoj.gov

Of Counsel

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 24

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STEFANIA M. PORCELLI
Assistant General Counsel, FBI
1110 Third Avenue
Seattle, Washington 98101
Tel. 206.262.2224

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 25

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## CERTIFICATE OF SERVICE

2    I hereby certify that I am an employee of the United States Attorney's Office for the

3    Western District of Washington, and that I am of such age and discretion as to be competent

4    to serve papers;

5    I certify that on August 15, 2016, I delivered the foregoing Motion for Summary

6    Judgment and Proposed Order to the following non-CM/ECF participant(s)/CM/ECF

7    participant(s), by sending it to the emails provided for this purpose by the Attorneys for the

8    City addressed as follows:

9    Jessica Nadelman
     Assistant City Attorney
10   Seattle City Attorney's Office
11   701 Fifth Avenue, Suite 2050
     Seattle, WA 98104-7097
12   jessica.nadelman@seattle.gov

13

14   Michael K. Ryan
     Assistant City Attorney Government Affairs
15   Seattle City Attorney's Office
16   701 Fifth Avenue, Suite 2050
     Seattle, WA 98104-7097
17   michael.ryan@seattle.gov

18

19        DATED this 15th day of August, 2016.

20

21                                    /s/Kayla C. Stahman
                                      KAYLA C. STAHMAN
22                                    Assistant United States Attorney
                                      United States Attorney's Office
23                                    700 Stewart Street, Suite 5220
24                                    Seattle, Washington 98101-1271
                                      Phone:  206-553-8786
25                                    Fax:  206-553-4067
26                                    E-mail:  kayla.stahman@usdoj.gov

27

28

MOTION FOR SUMMARY JUDGMENT
CASE NO.  16-CV-889 (RAJ) - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970